CRABTREE, J.T.C.
This is a local property tax ease wherein plaintiff seeks direct review of the 1987 and 1988 assessments on its property located at 808 Route 46, Parsippany, New Jersey (Block 698, Lot 15.3). The assessment for both years was:
[[Image here]]
At issue are the true value of the subject property and whether plaintiff is entitled to discrimination relief pursuant to N.J.S.A. 54:51A-6, commonly referred to as C. 123.
The subject of the controversy is a one-, two- and three-story building known as The Aspen Hotel, containing 196 rooms, with restaurant, lounge and banquet facilities, indoor pool and tennis court. The facility was built in 1982 and 1983, and is situated on 22 acres of land.
Plaintiffs expert estimated the true value of the subject property to be $9,507,000, including $600,000 for four acres of excess land, on October 1, 1986 for tax year 1987 and $10,196,-000, including $672,000 for four acres of excess land on October 1, 1987 for tax year 1988. In reaching these conclusions of value he utilized the cost and income approaches to value, placing primary reliance upon the latter. In arriving at a land value for the cost approach, as well as what he deemed to be excess land, he relied upon three land sales in the taxing district. After adjustments for time, location and physical characteristics, he estimated land value at $150,000 an acre on October 1, 1986, which, with a 12% time adjustment, he increased to $168,000 an acre for October 1, 1987. For his cost *130 approach, the expert relied upon actual construction costs as reflected in plaintiffs 1983 financial statement. To these figures he added a 15% entrepreneurial profit. He then applied a cost adjustment factor, taken from Marshall & Swift Valuation Service, to bring the costs up to October 1, 1986 and October 1, 1987. Finally, he added land value to arrive at total cost approach values of $9,256,100 for October 1, 1986 and $9,741,-200 for October 1, 1987. He took no depreciation in the development of these values.
For his income approach the expert relied upon the operating history of the hotel for the years 1983 through 1988. In stabilizing income to arrive an economic income for the tax years under review he assumed that an average room rate for all 196 rooms was the so-called commercial rate, which was the lowest of the three posted room rates. The average occupancy of rooms subject to the commercial rate was uniformly higher than the average occupancy of rooms subject to the higher rates.
On the basis of operating history he posited a 60% occupancy rate for 1986 and a 50% occupancy rate for 1987.
At this point the expert’s effective room income was $3,089,-214 for 1986 and $2,574,345 for 1987. (Actual room income for those years was $2,410,913 for 1986 and $1,648,863 for 1987.) He then added actual income from the restaurant, banquets and bar, subtracted food and beverage costs and added back real estate taxes and management fees to arrive at stabilized net income of $1,451,993 for 1986 and $1,583,409 for 1987.
The expert then made adjustments to exclude the hotel’s business value and the value of the furniture and equipment. The adjustment for business value was effectuated by way of a deduction of a management fee of 3.5% of gross income typically paid to a professional hotel management company in connection with the day-to-day operations of the hotel. The personal property adjustment took the form of an annual reserve equal to 3% of the undepreciated book cost of furniture and equipment.
*131 The expert postulated economic net income for 1986 and 1987 as follows:
[[Image here]]
The expert’s final step in his income approach to value was the application of a capitalization rate, including an effective tax rate. The capitalization rate was developed pursuant to the mortgage-equity band of investment technique, in connection with which he posited a 75% mortgage position, a 25% equity position, a 25-year mortgage at 10% interest for 1986 and 10.75% interest for 1987, and a 10% equity dividend for 1986 and 11% for 1987. The weighted overall rates using these assumptions were 10.68% for 1986 and 11.41% for 1987. The addition of an effective tax rate of 1.87% and 1.90% produced final capitalization rates of 12.55% for 1986 and 13.31% for 1987.
The data from which the expert derived his capitalization rates were found in the Investment Bulletin, a quarterly publication of The American Council of Life Insurance (ACLI).
Application of these rates produced value estimates, exclusive of excess land, of $8,907,000 for 1986 (for tax year 1987) and $9,524,000 for 1987 (for tax year 1988).
The expert concluded that 14 acres are devoted to the hotel and related parking area, two acres are devoted to a tennis court and jogging track and two acres are devoted to flood water storage. This, he opined, leaves four acres to the rear of *132 the property which could be utilized either for expansion of the hotel or for construction of an office building. On the basis of the comparable land sales referred to above he estimated the value of the excess land to be $600,000 on October 1, 1986 (for tax year 1987) and $672,000 on October 1, 1987 (for tax year 1988).
Defendant’s expert estimated the true value of the subject property to be $18,300,000 on October 1, 1986 and $19,225,000 on October 1, 1987. In developing these estimates he utilized all three approaches to value, placing primary reliance upon the income approach. His final value estimates included 11.99 acres of excess land which he valued at $225,000 an acre on October 1, 1986 and $252,000 an acre on October 1, 1987. The total value estimates for excess land were $2,700,000 on October 1, 1986 and $3,020,000 on October 1, 1987.
In arriving at these land value estimates the expert utilized four allegedly comparable vacant land sales, all of which were zoned for office building or research laboratory development. The sales occurred in 1984, 1985 and 1988 and the unadjusted sale prices ranged from $225,000 an acre to $485,800 an acre.
The expert used Marshall and Swift Valuation Service for his cost approach, supplemented by ten vacant land sales from which he derived his land value estimate. He applied 5% physical depreciation to the improvements for both years. The expert’s value estimates under the cost approach were $18,450,-000 for 1987 and $19,220,000 for 1988.
The expert’s market data approach involved six allegedly comparable sales of hotels located in Franklin Township, Tinton Falls, Saddle Brook, Seeaucus, Hanover Township and Morris Township. Three of these sale properties were Marriott hotels with many more rooms and amenities than the subject. The sales took place between September 1985 and January 1989. On the basis of these sales the expert concluded that the subject’s value was $90,000 a room ($17,640,000) on October 1, 1986 and $97,000 a room ($19,012,000) on October 1, 1987.
*133 For his income approach the expert purportedly relied upon revenues from five other hotels located in Morristown, Fair-field, East Hanover, Clifton and Montvale. Suffice it to say that his income approach has no probative weight. A major portion of his comparative income and expense analysis was stricken on plaintiffs motion during the trial. What remains is unpersuasive. The expert failed to make adjustments for business value and personal property for either the alleged comparables or the subject.
Similarly, by the expert’s own admission, the market data approach was, as he put it, “suspect” and “inherently weak”; and he frankly stated in his appraisal that the number and complexity of factors involved in establishing sales prices of hotel properties renders the comparative approach inappropriate for those properties.
Finally, his cost approach is fundamentally flawed because of his critical lack of knowledge. For example, he did not know the square foot area of the one-story portion of the building or the area containing three stories; he did not know the types of hotels included in the basic unit cost appearing in the Marshall and Swift Service.
The probative value of an expert’s opinion rests entirely upon the facts and reasoning offered in its support. Dworman v. Tinton Falls, 1 N.J. Tax 445 (Tax Ct.1980), aff’d o.b. per curiam 180 N.J.Super. 366, 3 N.J. Tax 1, 434 A.2d 1134 (App.Div.1981).
The search for true value in this case is thus focused almost entirely on the analysis of plaintiff’s expert.
To begin with, although a reliable cost approach may be based upon actual historic costs, Bostian v. Franklin State Bank, 167 N.J.Super. 564, 401 A.2d 549 (App.Div.1979), the income approach is frequently the best method of appraising hotels and in many cases is given the greatest weight. Hall and Benton, “Hotel and Motel Valuation,” Friedman, Encyclopedia of Real Estate Appraising (3 ed. 1978) at 631, 642. Knowledgeable buyers of lodging facilities generally base their *134 purchase decisions on factors such as forecasted net income and return on investment, which are not reflected in the cost approach. Rushmore and Rubin, “The Valuation of Hotels and Motels for Assessment Purposes,” The Appraisal Journal (April 1984) at 270, 273. The credible evidence in this case indicates that the income approach is the most viable method in ascertaining true value.
Plaintiffs expert relied upon actual revenues of the subject in developing his estimate of stabilized economic income, before adjustment for business value. He also relied upon the subject’s operating history in arriving at stabilized occupancy rates of 60% for 1986 and 50% for 1987.
Defendant contends that the expert’s stabilized income and occupancy rates are too low, that competent management would have achieved better results. The credible evidence does not support defendant’s claim that the subject hotel was not competently managed. While the principal designated by plaintiff to manage the hotel lacked formal education in hotel management, the evidence shows that he was aided by a professional staff with significant experience in the hospitality industry. The general manager had 30 years of experience in the industry; qualified people were in charge of corporate sales and food and beverage operations. The principal’s inability to explain certain accounting entries pertaining to management expenses does not lead to a conclusion that he was incompetent.
Defendant also argues that management incentives to maximize revenues were lacking because plaintiff’s principal did not have an incentive contract to manage the hotel. Defendant ignores the importance of the principal’s interest as one of plaintiff’s partners. A proprietary interest in the hotel is all the incentive he needs. Finally, defendant alludes to the participation of the hotel’s professional staff in management decisions as indicative of incompetent management. On the contrary, such participation is a bench mark of sound management.
Accordingly, I -conclude that the subject hotel is managed in an efficient manner so as to produce the optimal net income, *135 and that its operating revenues, as stabilized by plaintiff’s expert and adjusted for occupancy rates, are prima facie economic rent, subject to adjustments for business value and personal property. See Glen Pointe Assocs. v. Teaneck Tp., 10 N.J. Tax 380, 391 (Tax Ct.1989).
Plaintiff’s expert adjusted for the hotel’s business value by extracting from hotel revenues the fee customarily paid to a management company pursuant to a management contract. This is a method sanctioned by the appraisal community. See, e.g., Rushmore, Hotels, Motels and Restaurants: Valuations and Market Studies (1983) at 105-106; Nelson, Messer and Allen, “Hotel Enterprise Valuation,” The Appraisal Journal (April 1988) at 163-164; Glen Pointe Assocs. v. Teaneck Tp., supra at 391. I find the amount posited by the expert, viz., 3.5% of revenues, to be reasonable.
The expert adjusted for personal property by deducting 3% of a stabilized personal property value of $2,940,000 from revenues. He characterized this adjustment as a replacement reserve. His stabilized value was substantially less than undepreciated book costs, which averaged $3,747,215 over the years 1983, 1984 and 1985. He testified that his downward adjustment was designed to reflect the fact that some of the property represented fixtures taxable as real property pursuant to N.J.S.A. 54:4-1, as amended by ch. 117, L.1986.
The technique employed by the expert to extract the personal property from the hotel’s value is a variation of one of the methods recommended by a leading hotel valuation authority. See Rushmore, op. cit., supra at 103-104. Indeed the expert’s adjustment in this regard is, if anything, conservative, given the relatively short useful lives attributed to hotel furniture and equipment. I find his adjustment to be reasonable.
Furthermore, the expert’s method of recognizing fixtures taxable as real property is a sound approach. His implicit assumption of over $800,000 in fixtures for a hotel of the subject’s magnitude is eminently reasonable.
*136 Both experts relied for their capitalization rates upon the copious data published by the ACLI. As indicated above, plaintiffs expert posited a 10% mortgage interest rate for 1986 and a 10.75% interest rate for 1987. He also assumed an equity rate of 10% for 1986 and 11% for 1987. His weighted overall capitalization rate, assigning 75% to the mortgage and 25% to the equity, was 10.68% for 1986 and 11.41% for 1987, not including the effective tax rate.
Defendant’s expert also relied upon ACLI data. He agreed with plaintiff’s expert in the mortgage-equity positions (75%— 25%), and on the mortgage amortization period of 25 years. He posited mortgage interest rates at 10% for 1986 (as did plaintiff’s expert) and 10.5% for 1987; his assumptions of equity return were 8% for 1986 and 7% for 1987. His weighted overall capitalization rate, before the addition of the effective tax rate, was 10.18% for 1986 and 10.25% for 1987. The experts agreed on the effective tax rate for both years.
From the foregoing it appears that the experts agreed, not only on the mortgage-equity position and the mortgage amortization period (which is a factor in calculating the mortgage constant) but also on the mortgage interest rate for 1986. Their differences on the weighted equity component for 1986 and the weighted mortgage component for 1987 are insubstantial, a matter of 50 basis points and 16 basis points, respectively.
I find, however, that the ACLI data lend better support to defendant’s 1986 overall capitalization rate of 10.18%. The same data support plaintiff’s 1987 overall capitalization rate of 11.41%.
Accordingly, I find the appropriate capitalization rates, including the effective tax rate to be 12.05% for 1986 (for tax year 1987) and 13.31% for 1987 (for tax year 1988).
The sole remaining valuation issue to be resolved is that of excess land.
*137 The preponderance of the evidence favors plaintiff. The calculation of excess land posited by plaintiffs expert is consistent with the topography, configuration and uses of the parcel in question. The size of the hotel (196 rooms) and its ancillary facilities such as lounge, restaurant and banquet rooms, together with parking, support the expert’s conclusion that 14 acres are required for the hotel. Of the remaining eight acres, two are devoted to a tennis court and jogging track and two are devoted to flood water storage, leaving four acres for commercial development.
The excess land analysis of defendant’s expert is seriously flawed. To begin with, he assumes 12 acres of excess land, leaving only ten acres for the hotel, the tennis courts and jogging track and the flood water storage basin. The expert ignored the topography and configuration of the parcel, and these factors have a material bearing on the determination of excess land. See American Institute of Real Estate Appraisers, The Appraisal of Real Estate (8 ed. 1983) at 265-266. Also, all four of his excess land comparable sales were zoned for office buildings of 40,000 square feet or greater. The expert conceded on cross-examination that the planning board of defendant municipality would not approve construction of an office building in excess of 32,000 square feet on the subject parcel. This disparity prevents meaningful comparison of the comparable sale properties and is thus fatal to the probative utility of the expert’s comparable sales. Venino v. Carlstadt, 1 N.J.Tax 172 (Tax Ct.1980) aff’d o.b. per curiam 4 N.J.Tax 528 (App.Div. 1981).
In view of the above, I conclude that the excess land on the subject parcel is four acres and that its value is $150,000 an acre for tax year 1987 and $168,000 an acre for tax year 1988.
I find that the true value of the subject property was $9,876,-500 on October 1, 1986 for tax year 1987 and $10,195,500 on October 1, 1987 for tax year 1988, calculated as follows:
*138 [[Image here]]
It remains to be determined, in light of the court’s findings of true value, whether plaintiff is entitled to relief from a discriminatory assessment pursuant to N.J.S.A. 54:51A-6. That statute provides, in substance, that when the ratio of the subject property’s assessment to its true value exceeds the upper limit or falls below the lower limit of the common level range the court must enter judgment revising the assessment by applying the average ratio to the property’s true value.
Except for revaluation years, which are not involved in this case, the application of the statute (commonly referred to as c. 123) is automatic and is unaffected by relief sought in the litigants’ pleadings. Weyerhaeuser Co. v. Closter Boro., 190 N.J.Super. 528, 464 A.2d 1156 (App.Div.1983); Abe Schrader Corp. v. Secaucus, 8 N.J.Tax 390 (Tax Ct.1986).
The average ratio of assessed to true value of real property for each taxing district is that ratio promulgated by the Director, Division of Taxation on or before October 1 in each year pursuant to N.J.S.A. 54:1-35.1 for school aid purposes. N.J. S.A. 54:l-35a(a). The common level range for a taxing district is that range which is plus or minus 15% of the district’s average ratio. N.J.S.A. 54:l-35a(b).
The average ratios promulgated by the Director for defendant municipality and the common level ranges for tax years 1987 and 1988 are:
*139 [[Image here]]
The ratio of the 1987 assessment to the property’s true value for that year is 95.36%, which exceeds the upper limit of the common level range. The assessment will, therefore, be revised by applying the average ratio to the true value of the property.
The ratio of the 1988 assessment to the property’s true value for that year is 92.38%, which exceeds the upper limit of the common level range. The assessment will thus be revised by applying the average ratio to the true value of the property.
In view of the foregoing the assessments will be:
[[Image here]]
Judgment will be entered in accordance with this opinion.