KUSKIN, J.T.C.
Plaintiff, Newport Center, appealed the 1994, 1995, 1996 and 1997 local property tax assessments on eleven lots located in the Newport Redevelopment District of the City of Jersey City. The lots under appeal (all of which are in Block 20 as designated on the City’s Tax Map), and their respective assessments, are as follows:
Assessment for each of the
Lot 1994 Assessment years 1995-1997
1.02 (designated as Parcel A $4,522,151 $4,069,900 by plaintiffs app raiser)
1.03 (Parcel B) $6,022,626 $5,420,400
1.05 (ParcelC) $4,358,425 $3,922,600
1.06 (Parcel D) $2,335,685 $2,102,100
2.05 (Parcel E) $2,046,700 $1,842,000
2.06 (Parcel F) $2,641,300 $2,377,200
2.07 (Parcel G) $2,421,600 $2,179,400
2.09 (Parcel H) $3,378,700 $3,040,800
2.10 (Parcel I) $1,395,400 $1,255,900
3.02 (Parcel J) $1,837,000 $1,653,300
4.03 (Parcel K) $3,166,000 $2,849,400
Plaintiff also appealed the assessments on the following properties: Lots 2.14 and 2.16 in Block 20 for 1994 through 1997; Lot M.6 in Block 395.A for 1994; and Lot W.l in Block 395.A for 1997. Defendant, Jersey City, appealed the assessments on Lots 2.01, 2.08, 2.13, 2.15, 2.17, 2.22, 4.01, 4.04, and 4.05 in Block 20 for 1997. All such appeals have been withdrawn. See R. 8:3-9. The applicable ratios under N.J.S.A. 54:l-35a and 54:51A-6 (Chapter 123) for the years under appeal were:
1994— 83.43%
1995— 89.43%
1996— 92.69%
1997— 96.62%.
I
Highest and Best Use Analysis
The first step in the valuation process is to determine the highest and best use of each of the properties under appeal. *412 Plaintiffs appraiser opined that Lots 1.02, 1.03, 1.05, 1.06, 2.06, and 2.07 (hereinafter referred to collectively as the “Office Parcels”) each had a highest and best use for office development. Defendant’s appraiser offered no opinion as to the highest and best use of these lots. The record, therefore, provides no basis for a highest and best use determination other than that provided by plaintiffs appraiser. Accordingly, I accept such determination.
The appraisers agreed that Lots 2.05, 2.09, 2.10, and 3.02 (hereinafter referred to collectively as the “Residential Parcels”) each had a highest and best use for residential development. Defendant’s appraiser determined not only that the highest and best use of these lots was for residential development, but also that the density of development would be 200 units per acre, the maximum density permitted by the Newport Redevelopment Plan. This resulted in his assuming construction of the following number of units: Lot 2.05 — 117 units, Lot 2.09 — 326 units, Lot 2.10 — 150 units, and Lot 3.02 — 177 units.
I accept the determination by both appraisers that Lots 2.05,2.09, 2.10, and 3.10 have a highest and best use for residential development. I reject the density determination by defendant’s appraiser because the evidence does not support his conclusion that, as of the relevant valuation dates, these lots would be developed to their respective maximum densities as permitted by applicable zoning.
The Newport Redevelopment Plan, which sets forth zoning and related development regulations and criteria applicable to all properties in Newport Center, was adopted in February 1985. In the mid-to late-1980’s, there was initial enthusiasm for residential development in Newport Center and elsewhere in the Hudson County waterfront area. However, a hiatus in development activity commenced in approximately 1989 and continued until 1996 or 1997. The market improved somewhat during 1996 and 1997. The foregoing is reflected in the following summary of residential construction activity in the waterfront area.
*413 In Newport Center, 1948 residential units were built (that is, completed) between 1986 and 1988. No units were built between 1989 and 1997. Riverside I, containing 346 units, was under construction as of October 1, 1996 and the rental program commenced as of mid-1997, prior to completion. Construction of Riverside II, containing 444 units, commenced in early 1997. Under the Newport Redevelopment Plan, 9,000 dwelling units are permitted. As of 1998, only approximately 30% of these units have been built.
At other Hudson County waterfront properties, from Port Imperial in Weehawken in the north, through Hoboken to Port Liberte in Jersey City in the south, the following residential construction activity took place during the period 1988 to 1997:
Port Imperial — 10,000 residential units were planned; 3,000 were approved; none were built.
Hoboken Shipyard — 1,200 residential units were planned with 391 in the initial phase; none were built. The project is starting to move forward in 1998.
River-Pointe —construction of 147 units commenced in the late 1980’s. The sell-out of all units did not occur until the summer of 1995.
Hudson Exchange (Harsimus Cove) — 2,158 units were planned; 504 were built in the period 1994 to 1995.
Hudson Square South —150 units were built in early 1994.
Harborside —650 units were planned; none were built.
Colgate —500 units were planned; none were built.
Evertmst — 400 units were proposed in 1990; none were built.
Portside —one residential tower was built in 1993, but all 229 units were not leased until 1996. Another tower was built in 1996 with 275 units. Lease-up occurred in 1996-97.
Millmaster Onyx —324 units were proposed in 1990; none were built.
*414 Liberty Harbor North —8,000 units were planned; none were built.
Port Liberte, Phase II —690 units were planned; 200 were built in 1990-91. An additional 165 units have been completed as of 1998.
Actual development (as distinguished from potential development) at Newport Center, and the other properties described above, indicates that, as of the relevant October 1 assessing dates, the subject lots would not be valued in the marketplace based on development to their maximum permitted density. Defendant attempts to refute this indication by citing: (1) the density of residential development in Newport Center prior to 1990, averaging 227 units per acre, (2) the density of development at Riverside I (under construction as of October 1,1996) of 280 units per acre, and (3) the density of development at Riverside II (under construction as of early 1997) of 571 units per acre. However, the pre-1990 average density at Newport Center reflects the initial enthusiasm described above and not market conditions as of the assessment dates applicable to plaintiffs appeals. As to Riverside I and II, defendant failed to explain why densities of 280 and 571 units per acre, 40% and 185.5% higher than 200 units per acre, support the density determination by defendant’s appraiser of 200 units per acre for each of the Residential Parcels. Furthermore, that the densities in these specific projects exceed 200 units per acre does not diminish the significance of the general level of residential construction activity, as of the relevant valuation dates, demonstrated by the twelve projects described above, and by Newport Center itself. Even defendant’s appraiser acknowledged that residential development was “muted” on the Jersey City waterfront during the period 1991 to 1995. In addition, as discussed below, the comparable sales used by defendant’s appraiser reflect densities substantially below 200 units per acre.
Post-assessing dates proposals in 1997 and 1998 for additional construction, including Riverside III (376 units at a density of 442 units per acre) and Riverside IV (414 units at a density of 362 units per acre), do not support a density determination of 200 *415 units per acre, and, in any event, aré not reliable indicators of the likely density of development of the subject lots. As demonstrated above, proposals for development at Newport Center and other Hudson County waterfront properties have existed from 1991 to 1997, with very little resulting activity. Based on the foregoing analysis, I conclude that, in the marketplace, the probable density of development on the Residential Parcels would be estimated at considerably lower than 200 units per acre. The record does not provide a basis for determining the quantum of such lower density-
The appraisers disagreed as to highest and best use of Lot 4.03. This lot, which contains 4.95 acres, is in the Community Commercial District established by the Newport Redevelopment Plan. Permitted principal uses include retail sale of goods and services, as well as offices and residential. The permitted density for residential development is 200 units per acre. For retail development, the maximum permitted floor area ratio is 7:1. Plaintiffs appraiser determined the highest and best use of the lot to be for development with a 50,000 square foot one-story retail building. Defendant’s appraiser determined a highest and best use for residential development with 990 apartment units.
The immediate area surrounding Lot 4.03 consists of the following:
• to the north — 14th Street, then a 130,000 square foot Bradlees retail store (now vacant);
• to the eastn-Washington Boulevard, then subject Lot 3.02 with a residential highest and best use, and the Residential Towers apartments (two, thirty-three story towers);
• to the south — Newport Parkway, then subject Lot 1.02 with a highest and best use for office development;
• to the west — Holland Tunnel portals and industrial loft buildings.
Located diagonally to the southwest is the Newport Center Mall, and diagonally to the northwest is a strip shopping center. Easements for the Holland Tunnel westbound tube and a planned above-ground light rail line affect approximately 1.98 acres of the Lot, leaving an unencumbered area of approximately three acres. The above-described surrounding uses would be compatible with *416 either residential or retail use of Lot 4.03. The proximity of apartments would both complement a residential use and enhance the desirability of the lot for retail development. No other residential lot in Newport Center will have the light rail line running through it.
Plaintiffs appraiser concluded that construction on the Holland Tunnel easement was problematical because the easement is at, or near, the surface. He contrasted this condition with subject Lot 2.09, where one braiding of the Riverside III development (if constructed) will extend on to the Holland Tunnel easement area, but the easement is approximately thirty feet below the surface.
In concluding that a 50,000 square foot retail development was the highest and best use for Lot 4.03, plaintiffs appraiser considered the physical characteristics of the lot, the impact of the easements encumbering the lot, the surrounding uses described above, the existence of other more desirable residential land, and the residual need for community retail type development. His analysis was more thorough and more persuasive than that of defendant’s appraiser.
In concluding that residential development of 990 units was the highest and best use for Lot 4.03, defendant’s appraiser used the maximum permitted density of 200 residential units per acre for all 4.95 acres. He found that such 990 unit development would create a much higher value than a 50,000 square foot retail development. The appraiser acknowledged that he did not know what study, if any, was done to determine whether the permitted 200 units per acre could be built on this parcel. He made no investigation of, and gave no consideration to, the feasibility or cost of building on the Holland Tunnel easement. He did not discuss the impact of the light rail line. His reason for not investigating the impact of the easements encumbering the lot was his understanding that the density of development set forth in the Newport Redevelopment Plan took into account, and was “net of,” such easements.
*417 I reject the analysis of defendant’s appraiser. Even if the Newport Redevelopment Plan densities were “net” of easements, the Plan permits multiple uses on Lot 4.03, and the particular development and density envisioned for this parcel may not have been for residential construction. A drawing included by defendant’s appraiser in his appraisal report shows the parcel as a retail development site. Furthermore, for the reasons discussed above, I reject the conclusion that residential development on any lot under appeal will be at the maximum permitted density. Defendant’s appraiser made no analysis of the desirability of Lot 4.03 for residential development in context of other lots available for such development. See Appraisal Institute, The Appraisal of Real Estate 306 (11th ed.1996) stating that: “Although a given site may be particularly well-suited for a specific use, there may be a number of other sites that are equally or more appropriate. Therefore, the appraiser must test the highest and best use conclusion to ensure that existing and potential competition from other sites has been fully recognized.”
The definition of highest and best use refers to “the reasonably probable and legal use of vacant land----” Id. at 297. Based on the foregoing analysis, I conclude that the reasonably probable use of Lot 4.03, as of the relevant assessing dates, was for retail development in accordance with determination of plaintiffs appraiser.
II
Office Parcels
I turn now to valuation of the various lots under appeal. Both appraisers valued all lots using only the market data (comparable sales) approach. I begin with the Office Parcels. My valuation analysis as to these Lots is circumscribed, and, in some respects, controlled by evidentiary rulings during plaintiffs direct case and rulings on defendant’s motion to dismiss at the end of plaintiffs case. These rulings related to the comparable sales used by plaintiffs appraiser in valuing these Lots.
*418 A. Exclusion of Comparable Sales — General
Plaintiffs appraiser testified that the highest and best use of the Office Parcels was for office development, even though his appraisal report described a somewhat broader highest and best use, namely, “mixed use office, retail commercial and hotel development.” In valuing the Parcels, the appraiser relied upon three comparable sales. Sale No. 1, involving property located in the Hudson Exchange Redevelopment District in Jersey City, occurred in December 1996. As described by plaintiffs appraiser, the sale property was “proposed to be developed with a 200 room, high rise hotel tower.” Sale No. 2, involving property in Hackensack, New Jersey, sold in September 1995. As described by plaintiffs appraiser, the sale property was “to be developed with a 210 bed long-term care nursing home with a three level parking garage.” Sale No. 7, involving property in the Hudson Exchange Redevelopment District, occurred in August 1994. As described by plaintiffs appraiser, the property was “developed with a mid-rise rental apartment complex containing a total of 504 apartment units and known as Avalon Cove.” The appraiser made no specific highest and best use determination for these (or any other) comparable sales, and assumed, as did I, that the proposed development of each property, as reflected by the sale, was its highest and best use.
I sustained defendant’s objection to the admissibility of Sales Nos. 2 and 7 for all years under appeal, and sustained defendant’s objection to the admissibility of Sale No. 1 as to tax years 1994 and 1995. I recognize that, for a judge sitting without a jury, evidence rules may be applied liberally. Here, however, after full voir dire as to these Sales, I concluded that the respective highest and best uses of Sales Nos. 2 and 7, as indicated by the development described by plaintiffs appraiser, were so dissimilar to a highest and best use for office development, or for a mixed use of office, retail commercial, and hotel development, as to render those sales of no assistance to the court in valuing the Office Parcels. As to Sale No. 1,1 concluded that a sale occurring more than two years after the valuation dates of October 1, 1993 *419 and October 1, 1994, was too remote in time to be a reliable indicator of value as of those dates. I ruled accordingly. See Ford Motor Co. v. Edison Tp., 127 N.J. 290, 307, 604 A.2d 580 (1992) (noting that “[a]ppellate courts have long recognized that the trial court must be granted ‘a wide discretion’ in determining the admissibility of sales sought to be relied on as comparable.” (citation omitted)). The following discussion amplifies my rulings.
B. Exclusion of Comparable Sales Nos. 2 and 7 — Dissimilar Use
The analysis for my ruling as to Sales Nos. 2 and 7 began with the basic principle of appraisal practice that “the highest and best use of land as though vacant ... should be the same or similar for each comparable property as for the subject property.” The Appraisal of Real Estate, supra, at 303. The Supreme Court in Ford Motor Co. v. Edison Tp., supra, 127 N.J. 290, 604 A.2d 580, set forth the “general principles” applicable to the admissibility in evidence of comparable sales by adopting the following language from Moorestown Tp. v. Slack, 85 N.J.Super. 109, 114, 204 A.2d 23 (App.Div.1964):
Notwithstanding the “substantial similarity in conditions” test for admissibility of comparable sales ... there is pronounced recognition ... that such similarity need not obtain in all comparative respects, so long as there is sufficient similarity in some significant respects to permit the expert testifying, or the fact-finder, to draw rational probative valuation inferences from the sales cited, after weighing and allowing for such differences as do obtain between the properties sold and that which is the subject of the valuation litigation. The weight to be accorded the sales, either as direct evidence of value or as support for the expert’s opinion of value, is for the fact-finder.
[Ford Motor Co. v. Edison Tp., supra, 127 N.J. at 307, 604 A.2d 580 (citation omitted.).]
The Court also described comparable sales as including “all sales that will lend logical, coherent — support if they show ‘comparable building density ratios, functional similarities, proximity of sale dates to assessing dates, similarity of age, construction and condition, and in some cases, size.’ We would not assume that a functional similarity is a synonym for a demand for an identical highest and best use.” Id. at 308, 604 A.2d 580 (citations omitted). The Court thus indicates that, in determining the admissibility of *420 comparable sales, a trial court should not require identity of highest and best use. Sales must, however, enable the fact-finder to “draw rational probative valuation inferences”, Id. at 307, 604 A.2d 580, and lend “logical, coherent support” to an opinion of value. Id. at 308, 604 A.2d 580.
The purchase price for developable land is a function of the projected use of the land. “The value of the site depends on its potential highest and best use.” The Appraisal of Real Estate, supra, at 340. “Land has value because it provides potential utility as the site of a structure, recreational facility, agricultural tract, or right-of-way for transportation routes. If land has utility for a specific use and there is demand for that use, the land has value to a particular category of users.” Id. at 321. “Land value is substantially affected by the interplay of supply and demand, but it is the economic use of a site that determines its value in a particular market. For example, the price that a developer can afford to pay for a warehouse site is determined by the net income that the warehouse will earn and the cost of constructing it.” Id. at 322.
In opposing defendant's objection to the admissibility of Sales Nos. 2 and 7, plaintiff argued that such Sales were appropriate comparables because: (1) each was a sale for a type of commercial development involving a high rise building and (2) after an extensive search, plaintiffs appraiser could find no sales of land for office development which occurred within a reasonable time proximity to the applicable valuation dates. I rejected plaintiffs first argument because the value of land for one type of commercial development does not necessarily reflect value for another type of development. See Riegel Products Corp. v. Milford Bor., 13 N.J.Tax 546 (Tax 1994), where the court, in valuing property having a highest and best use for “heavy manufacturing, paper manufacturing and kindred uses,” rejected sales as “not comparable because of the substantial difference from the subject in size and utility and because the properties were sold vacant and purchased either for warehouse or multi-tenant use, not heavy manufacturing.” Id. at 559-560. See also Westmount Plaza v. *421 Parsippany Troy Hills Tp., 11 N.J.Tax 127 (Tax 1990), where the court, in valuing excess land on which an office building containing a maximum of 32,000 square feet could be built, rejected comparable sales zoned for office buildings containing 40,000 square feet or more because “[tjhis disparity prevents meaningful comparison of the comparable sale properties and is thus fatal to the probative utility of the expert’s comparable sales.” Id. at 137.
Sale No. 2 used by plaintiffs appraiser was for use as a nursing home development. Nursing homes are valued on a basis different from office buildings. An office building is valued based upon the square foot area of the building and the anticipated rent per square foot. See Hull Junction Holding Corp. v. Princeton Bor., 16 N.J.Tax 68, 98-99 (Tax 1996); Glen Pointe Assocs. v. Teaneck Tp., 10 N.J.Tax 506, 521 (Tax 1989), reconsideration denied, 10 N.J.Tax, 598 (Tax 1989), aff'd, 12 N.J. Tax 127 (App. Div.1991). Investors view nursing homes not in terms of rentable square feet but in terms of the number of beds, which are the basic units of income generation. See Twin Oaks Assoc. & Health Resources of Morristown, Inc. v. Morristown, 9 N.J.Tax 386 (Tax 1987) aff'd, 11 N.J.Tax 94 (App.Div.), certif. denied, 117 N.J. 155, 564 A.2d 875 (1989) where the court stated:
Proprietary nursing homes have unique characteristics which make it difficult to estimate their market value. Beal estate alone is not the primary income producer as in an apartment house. Income is produced by a combination of the real estate, the personal property, which includes furniture, fixtures and equipment, and the services rendered by the staff, including food, 24^-hour nursing services and activities for the patients. There is a limited market for proprietary nursing homes, and the real estate has limited alternate uses. The ability of the nursing home property to produce income is the source of the value of the real estate, but the income approach and the market approach suffer the disability of combining the value of the real estate with the value of the business conducted in the real estate. The income depends on the mix of private and Medicaid patients and the efficiency of management in maximizing income and minimizing expenses.
[Twin Oaks, supra, 9 N.J.Tax at 394 (citation omitted).]
See also Scott Swamp Realty Ltd. Partnership v. Farmington, 1995 WL 127818 (Conn.Super.Ct.1995).
The factors described in Twin Oaks influence the price analysis by the seller and purchaser of land to be used for nursing home development. None of these factors influence the price analysis *422 applicable to land to be used for office development. As a result, even though an office building and nursing home of the same square foot area may both be analyzed by investors based on income, the two analyses cannot be correlated and there is no intrinsic or definable relationship between the two values. A property sold for nursing home use, therefore, does not: (a) have a sufficient “functional similarity” to property having a highest and best use for office developments, (b) provide a “logical, coherent” indication of the value of the office property, or (c) provide a basis for a “rational probative” inference as to the value of the office property.
Sale No. 7 used by plaintiffs appraiser was a sale of land for immediate development with 504 apartments. For apartment developments, income is a function of the number of units. The Appraisal of Real Estate, supra, at 402. As a result, the relationship between the square foot area of an apartment complex and the area of an office development does not indicate the value relationship of the two properties. See Parkview Village Assocs. v. Collingswood Bor., 62 N.J. 21, 297 A.2d 842 (1972), where the Supreme Court comments that, for apartment houses, analysis on the basis of rent per apartment or room is “customary” as compared to commercial and industrial properties “where square foot unit rentals are commonly used in appraisals.” Id. at 31, 297 A.2d 842. Thus, the purchase price in Sale No. 7 was, in all likelihood, based on an analysis of apartment units, as plaintiffs appraiser suggested when questioned by the court. Accordingly, the sales price provides no “logical, coherent” indication of the value of a site to be developed for office use, and provides no basis for a “rational probative” inference as to such value.
I recognize that the appraisal report of plaintiffs appraiser indicated a highest and best use of mixed use for office, retail commercial, and hotel development. The appraiser’s Sales Nos. 2 and 7, however, are no more helpful in valuing land for such mixed use than they are for an office use alone, particularly when the appraiser had not determined which combination of uses, and in what proportions, would be located on each of the Office Parcels. *423 Neither of the sales was for development with a mixed use and neither was for a use included within the mixed use described by plaintiffs appraiser. As a result, neither of the sales provides any indication of the value of the subject parcels for retail commercial development, or hotel development, either alone or in combination.
The price payable for land for retail development is a function of rentable area, as is the price payable for office development. See Hull Junction Holding Corp. v. Princeton Bor., supra, 16 N.J.Tax at 104; Pine Plaza Assocs. v. Hanover Tp., 16 N.J.Tax 194, 201-204 (Tax 1996). The price payable for land to be developed with a hotel is a function of anticipated revenue per room. Such revenue is derived not only from room charges, but also from sales of food and beverages and other items of business income (e.g., telephone charges). See Westmount Plaza v. Parsippany Troy Hills Tp., supra, 11 N.J.Tax at 130, 135; The Appraisal of Beal Estate, supra, at 402. See generally, Rushmore, Hotels & Motels: A Guide to Market Analysis, Investment Analysis and Valuations (1992). Because of these differing bases for determining value, a sale of land for nursing home development (Sale No. 2) (where land value is a function of anticipated revenue per bed) and a sale for apartment development (Sale No. 7) (where land value is a function of anticipated revenue per apartment unit) provide no value indication for land to be developed for retail use or for hotel use, just as such sales provide no value indication for land to be developed for office use.
I also rejected plaintiffs contention that, because land sales for office development were unavailable, the court should be flexible in its consideration of available data. I do not doubt the testimony by plaintiffs appraiser that he was unable to locate comparable sales of land for office development. Nevertheless, the court has a responsibility (a) to determine whether the plaintiff has overcome the presumption of correctness which attaches to assessments, Ford Motor Co. v. Edison Tp., supra, 127 N.J. at 312, 604 A.2d 580 (citing Pantasote Co. v. Passaic, 100 N.J. 408, 413, 495 A.2d 1308 (1985)), and (b) if so, to determine the value of the property under appeal. A sale which provides no logical, *424 coherent basis for making either of those determinations does not become more probative, more convincing, or more admissible, because of the paucity, or even non-existence, of data which would provide such a basis. See Global Terminal & Container Service v. Jersey City, 15 N.J.Tax 698 (App.Div.1996) (affirming the Tax Court’s rejection of comparable sales because of the magnitude of adjustments made by the appraisal expert, where the Tax Court recognized that the rejected sales “were the sales that were out there. That’s all there were.” Id. at 702.). In Glen Wall Assocs. v. Wall Tp., 99 N.J. 265,491 A.2d 1247 (1985), the Supreme Court, commented that “the volume of information that is required to support an expert’s opinion must be kept within practical and realistic limits” and then stated: ‘We do not suggest that a court should accept an expert’s opinion that is unsubstantiated.” Id. at 280, 491 A.2d 1247.
The sales comparison approach is not always sufficient to support a valuation opinion.
When the market is weak and the number of market transactions is insufficient, the applicability of the sales comparison approach may be limited____Nevertheless, data on sales and offers for similar properties may establish broad limits for the value of the property being appraised, which may help support the findings of the other value approaches applied.
Generally, the sales comparison approach has broad applicability and is persuasive when sufficient data are available.
[The Appraisal of Real Estate, supra, at 399.]
Here, the sales which plaintiffs appraiser used were not “similar” to the Office Parcels. Even if I considered the sales to be “similar,” they would provide only “broad limits” of value to support other value approaches. Plaintiff was not prepared to present any other value approaches, even though other approaches were available. The Appraisal of Real Estate, supra, suggests that, when sufficient data on comparable vacant land sales are not available, land value can be determined “by allocation or extraction,” Id. at 326, or by the “land residual technique.” Id. at 327. Plaintiff elected not to use any of these alternate valuation techniques (except, as discussed below, during the trial after my exclusionary rulings as to Sales Nos. 1, 2, and 7 used by plaintiffs appraiser). The result of plaintiffs choice should not be a relax *425 ation of the well-established standards of proof in tax appeal matters.
C. Exclusion of Comparable Sale No. 1 — Remoteness in Time
My ruling excluding, as to tax years 1994 and 1995, Sale No. 1 used by plaintiffs appraiser, on grounds of remoteness in time, is consistent with a number of decisions expressing reluctance and reservations as to the use of post-assessing date information. In New Brunswick v. Division of Tax Appeals, 39 N.J. 537, 189 A.2d 702 (1963), the Supreme Court rejected the use of rental information which was not “known and anticipated as of the assessing date.” Id. at 545, 189 A.2d 702. A similar rejection of “hindsight” as to rental values appears in Parkview Village Assocs. v. Collingswood Bor., supra, 62 N.J. at 29, 297 A.2d 842. This strict approach has not been applied in connection with post-assessing date sales information, which the Supreme Court has permitted to be used to corroborate a value opinion otherwise established. In re Erie Railroad System, 19 N.J. 110, 130-131, 115 A.2d 89 (1955).
In Stanford Enterprises v. East Orange, 1 N.J.Tax 317 (Tax 1980), the Tax Court held that post-assessing date sales could be used to corroborate an opinion of value based on pre-assessing date information. The court also noted that: “Whether such subsequent events, when offered in conjunction with evidence known or reasonably anticipated as of the assessing date, are used in corroboration or as direct evidence is more theoretical than real.” Id. at 324. But see, Fort Lee Bor. v. Invesco Holding Corp., 3 N.J.Tax 332, 336-340 (Tax 1981), modified, 6 N.J. Tax 255 (App.Div.), certif. denied, 94 N.J. 606, 468 A.2d 238 (1983).
A more liberal approach to the use of post-assessing date sales appears in Almax Builders, Inc. v. Perth Amboy, 1 N.J.Tax 31 (Tax 1980), where the court applied the concept of relevance to such sales and concluded that “[s]o long as a proffered sale is not remote, the sale should be admitted for its rational probative valuation inference.” Id. at 37. This general approach was adopted in Little Ferry Bor. v. Vecchiotti, 7 N.J.Tax 389 (Tax *426 1985) where the Court held that “unless a subsequent event is clearly barred by considerations such as remoteness in time or location, or is virtually totally dissimilar to the property in question, the mere fact that it took place subsequent to the assessment date should not bar it from consideration in the valuation process.” Id. at 398. In Glen Wall Assocs. v. Wall Tp., 99 N.J. 265, 491 A.2d 1247 (1985) the Supreme Court noted that, in using comparable sales “[t]he benefit of the comparison is lost if the effects of time have altered the factors which result in a determination of value,” Id. at 283, 491 A.2d 1247, and then held that “the sale of the property, less than three months after the assessment date, [should be utilized] as an indicator of value.” Ibid. Recently, the Tax Court, in City of Atlantic City v. Ginnetti, 17 N.J.Tax 354 (Tax 1998) used post-assessing date data “because such data is of assistance in ultimately determining what the fair market value of the subject properties is.” Id. at 365.
Even those decisions which liberally permit the use of post-assessing date information indicate that information remote in time cannot be used. The cases do not, however, provide a definition of “remote.” In Venino v. Carlstadt Bor., 1 N.J.Tax 172 (Tax 1980), aff'd. o.b., 4 N.J. Tax 528 (App.Div.1981), the court utilized a comparable sale which occurred 2)6 years after the earliest assessing date at issue. By contrast, in Wedgewood Knolls Condo. Ass’n. v. West Paterson Bor., 11 N.J.Tax 514 (Tax 1991), the court considered a comparable sale occurring ten months after the assessing date but refused to consider a sale occurring more than thirteen months after the applicable assessing date. Id. at 524-525. See also, Almax Builders, Inc. v. Perth Amboy, supra, 1 N.J.Tax 31, where the court admitted into evidence a sale of the subject property occurring seven months after the assessing date, and Samuel Hird & Sons, Inc. v. Garfield, 87 N.J.Super. 65, 70-71, 208 A.2d 153 (App.Div.1965), where the court considered a sale occurring 8 % months after the assessing date.
*427 Plaintiffs appraiser testified that the real estate market was stable from October 1993 through December 1996. Accordingly, he made no adjustments for market conditions to any of his comparable sales. He based his conclusion of stability on the degree of changes in the prime rate, the national unemployment rate and the consumer price index. He provided no factual evidence, however, to demonstrate a correlation between these factors and real estate values in Hudson County, New Jersey. He also referred, in vague and general terms, to levels of construction activity, but provided no details as to such activity or as to the correlation between such activity and Hudson County land values. The Chapter 123 ratios for the years under appeal, which reflect the relationship between assessments and sales prices, had relative increases of 7.2% between 1994 and 1995, 3.65% between 1995 and 1996, 4.2% between 1996 and 1997. These ratios are not a wholly reliable or accurate measure of real estate value trends because the ratios are influenced by changes in assessments (the assessments on the subject Lots changed from 1994 to 1995) and by the nature and number of properties which sell. The ratio pattern, however, suggests a decline in real estate values, contrary to the unsupported opinion of plaintiffs appraiser.
The greater the time gap between the assessing date and the sale date, the more likely that meaningful changes in market conditions have occurred. Here, plaintiffs appraiser failed to demonstrate that the market was “flat” between October 1993 and December 1996. I concluded, therefore, that his Sale No. 1, which occurred in December 1996, more than three years after the October 1, 1993 assessing date and more than two years after the October 1, 1994 assessing date, was remote in time as to those assessing dates, and, therefore, was inadmissible as to tax years 1994 and 1995. Because the sale occurred within two years of the October 1,1995 and October 1,1996 assessing dates for tax years 1996 and 1997, respectively, I admitted the sale as to those years.
Immediately after the evidential rulings discussed above as to its appraiser’s Sales Nos. 1,2, and 7, plaintiff moved to adjourn the trial in order to permit the appraiser to prepare a *428 land residual approach to value the Office Parcels. I denied that motion because I determined that interruption of the trial was inappropriate where: 1) plaintiffs attorney and appraiser were experienced in tax appeal valuation standards; 2) plaintiff could, and should, have anticipated the weakness of the comparable sales approach, and could not claim surprise at my evidential rulings; 3) plaintiff could have included a land residual approach as an alternate valuation approach in its appraisal report prepared prior to trial; and 4)' plaintiff had opposed a pre-trial motion by defendant seeking discovery of income and expense information for properties not under appeal so that defendant’s appraiser could prepare a land residual approach. In its letter brief in opposition to the motion, plaintiff asserted that “the land residual technique is not proper in this case” because the criteria for such approach were not, or could not be, satisfied.[1]
I had previously denied defendant’s discovery motion because, based on the limited information disclosed by motion papers, I concluded that: a) given the uncertainties as to the development of the Office Parcels and the difficulties in obtaining market capitalization rates, the land residual technique was unlikely to provide a rehable basis for valuing such Parcels; b) the information sought related to properties not under appeal and owned or controlled by entities having varying degrees of relationship to plaintiff; and c) the land residual approach was, as defendant’s appraiser stated in his Certification in support of the discovery motion, only a secondary basis for his valuation opinion. Under such circumstances, intrusion by the defendant into the confidential financial records of entities related to plaintiff was inappropriate.
*429 D. Valuation of Office Parcels
As a result of the foregoing evidential rulings, I granted defendant’s motion, made at the end of plaintiffs case, to dismiss the pending appeals as to the Office Parcels for tax years 1994 and 1995. Only the 1996 and 1997 appeals remain, with plaintiffs proofs consisting only of its appraiser’s opinion based solely on his Sale No. 1. I conclude that plaintiff has failed to overcome the presumption of correctness which attaches to the assessments on the Office Parcels for tax years 1996 and 1997. As stated by the Supreme Court in Pantasote Co. v. Passaic, supra, 100 N.J. at 413, 495 A.2d 1308, the evidence required to overcome the presumption must be “definite, positive and certain in quality and quantity.” The court is required to find value if convinced that the original assessment is “unreliable.” Ford Motor Co. v. Edison Tp., supra, 127 N.J. at 313, 604 A.2d 580. Plaintiffs proofs did not satisfy the Pantasote Co. standard and did not establish that the assessments on the Office Parcels were unreliable. Defendant presented no testimony or other valuation evidence as to these lots.
Sale No. 1 used by plaintiffs appraiser, a sale for hotel use, provides no support for the appraiser’s opinion as to the value of the subject lots for office use. Both office buildings and hotels, as income producing properties, are valued using an income approach which reflects the methodology used in the marketplace. As discussed above, however, the value of land for office building use is a function of rentable square feet and anticipated rent per square foot, and the value of land for hotel use is a function of the number of rooms and anticipated revenue per room. Plaintiff failed to demonstrate any correlation between land value for office use and land value for hotel use. See The Appraisal of Real Estate, supra, at 303, stating that “it may be inappropriate to use a comparable property that has a highest and best use as an office building in appraising a subject property that has a highest and best use as a hotel.” As also discussed above, the appraisal report of plaintiffs appraiser indicated a mixed highest and best use for the Office Parcels, which mixed use includes hotel use. Even if I *430 were to isolate hotel use as the highest and best use of one or more of such Parcels, plaintiffs proofs were inadequate because plaintiffs appraiser testified, on cross-examination, that he valued none of such Parcels as a hotel site and could not identify which of the Parcels would be used for hotel development.
I note, parenthetically, that, even if I had overruled defendant’s objections to the admissibility of Sales Nos. 1,2, and 7 of plaintiffs appraiser, I would have affirmed the assessments on the Office Parcels based on the evidence in the record. Pursuant to R. 1:7-3, plaintiff presented, through its appraiser, full testimony as to the excluded comparable sales and defendant conducted a full cross-examination. I am able, therefore, to analyze and evaluate plaintiffs proofs as to the Office Parcels. Defendant presented no valuation proofs as to these Lots. If, after admitting Sales 1,2, and 7 into evidence for all years under appeal, I had given the sales their appropriate weight, I would have concluded that they provided inadequate proof, and inadequate support for an opinion of value, sufficient to (a) overcome the presumption of correctness applicable to the assessments on the Office Parcels or (b) establish that the assessments on those Parcels were unreliable.
Based on the foregoing analysis and discussion, I affirm the assessments on the Office Parcels as follows:
Assessment for each of the
Lot 1994 Assessment years 1995-1997
1.02 $4,522,151 $4,069,900
1.03 $6,022,626 $5,420,400
1.05 $3,922,600 $4,358,425
1.06 $2,102,100 $2,335,685
2.06 $2,377,200 $2,641,300
2.07 $2,179,400 $2,421,600
III
Valuation of Residential Parcels
I turn now to the Residential Parcels, Lots 2.05, 2.09, 2.10 and 3.02. As noted above, both appraisers determined that these *431 Parcels had a highest and best use for residential development. Plaintiffs appraiser, on the basis of three comparable sales, valued Lots 2.05, 2.09, and 2.10 at $1,000,000 per acre and Lot 3.02 at $900,000 per acre. Defendant’s appraiser, on the basis of five comparable sales, valued these lots based on a permitted maximum density of 200 units per acre with a per unit value of $15,000. The appraisers’ respective findings of value are as follows:
Parcel Plaintiff Defendant
Lot 2.05 $ 585,000 $1,755,000
Lot 2.09 $1,630,000 $4,890,000
Lot 2.10 $ 750,000 $2,250,000
Lot 3.02 $ 795,000 $2,655,000
The three sales used by plaintiffs appraiser were his Sales Nos. 1, 2, and 7, the same sales used by him to value the Office Parcels. I sustained defendant’s objection to the admissibility of Sales Nos. 1 and 2. Based on an analysis similar to that set forth above, I concluded that a sale for hotel purposes (Sale No. 1) and a sale for nursing home development (Sale No. 2) provided no information as to the value of the Residential Parcels for a residential highest and best use. If I had admitted the sales into evidence, for reasons similar to those I have set forth with respect to the Office Parcels, I would have given such sales very little weight, and they would not have affected the following analysis and value conclusions.
The sales used by defendant’s appraiser all sold for residential use, with two of the sales also including retail use. Sale No. 1 used by defendant’s appraiser is the same as Sale No. 7 of plaintiffs appraiser. This sale, as described above, involved property in Jersey City which sold in August 1994 for development with 504 apartment units. The sale reflects a price of approximately $770,000 per acre and approximately $17,000 per apartment unit. Defendant’s appraiser made no adjustments to the sale. Plaintiffs appraiser applied a positive 30% size adjustment, thus indicating a value for the subject Lots 2.05, 2.09, and 2.10 of $1,000,000 per acre. For Lot 3.02, plaintiffs appraiser made a positive 30% adjustment for size and a negative 10% adjustment *432 for location. The latter adjustment was based primarily on inferi- or views. As a result, the sale indicated a $900,000 per acre value for Lot 3.02.
Sale No. 2 used by defendant’s appraiser, which occurred on June 24, 1993, involved a property in Hoboken on which 150 residential units were constructed. The sale included the right to use an adjoining parking garage for parking by building occupants. The availability to the developer of parking without incurring the cost of constructing a parking facility undoubtedly affected the purchase price for the property. Indeed, the Amended and Restated Land Disposition Agreement for the comparable sale property, dated June 24,1993, indicates a $3000 per unit value for available parking and provides for adjustment of the purchase price if more or fewer than 75 of the proposed 150 units utilize the existing garage for parking.
Notwithstanding these express provisions of the Agreement, defendant’s appraiser made no adjustments to this sale, because he assumed that off-site parking would be available for the subject Residential Parcels. The appraiser did not testify to any study he made to confirm this assumption, nor did he determine what costs would be incurred to provide parking for any of Residential Parcels. Under the Newport Redevelopment Plan, off-street parking must be provided for each parcel developed. The parking may be on-site or off-site.
I give limited weight to Sale No. 2 because of the appraiser’s failure to make adjustments for the parking available to the sale property, and because the Land Disposition Agreement states that the land being sold was “the last remaining undeveloped parcel” in the River Street Redevelopment Area. This latter factor may have affected the sales price. See The Appraisal of Real Estate, supra, at 322 stating that: “Intense competition for choice sites or for the last remaining sites in a particular location can cause prospective owners or owner-occupants to pay more for a particular site than is indicated by the broad spectrum of market activity and the highest and best use of the site.”
*433 Sale No. 3 used by defendant’s appraiser, which occurred on March 31, 1993, involved property in the Central Business District of Hoboken having approvals for 222 residential units, 56,000 square feet of retail commercial space and a 360 car parking garage. The sale also included an old supermarket building. Defendant’s appraiser did not allocate the purchase price among the several components approved for development. Accordingly, his conclusion that the sale reflects $21,622 per residential unit, including 56,000 square feet of commercial space, is not informative of the price per unit or per acre for residential units only. I give this sale very little weight.
Sale No. 4, which occurred on December 30, 1992, involved property in Hoboken which sold at a deed price of $1,350,000, reflecting $3,461 per residential unit and $103,846 per acre. Defendant’s appraiser, in evaluating this sale, added to the purchase price $2,000,000 for environmental clean-up and $1,000,-000 for demolition costs. The appraiser had no documentation as to these costs and made little, if any, attempt to verify the costs beyond a conversation with a representative of the purchaser. Although appraisal experts may rely on hearsay under N.J.R.E. 703, the court retains the right and obligation to weigh the information on which the appraiser relies. Coastal Eagle Point Oil Co. v. West Deptford Tp., 13 N.J.Tax 242, 299-300 (Tax 1993), aff'd. o.b., 15 N.J.Tax 190 (App.Div.), certif. denied, 143 N.J. 320, 670 A.2d 1061 (1995). I find the information as to clean-up and demolition costs used by defendant’s appraiser to be insufficient to demonstrate that the costs he assumed were in fact incurred. On this basis alone, I find his analysis of this sale to be of very limited assistance in valuing of the subject property.
The weight to be accorded to Sale No. 4 is further diminished by (a) the appraiser’s varying understandings as to whether approvals for construction of 390 residential units were in place or only being sought at the time of sale, (b) uncertainty as to whether the proposed number of units was 390 or a greater number, and (c) uncertainty as to whether any portion of the purchase price was attributable to the commercial development which defendant’s *434 appraiser described as “possible but not approved.” The Resolution adopted by the Hoboken Planning Board, on January 7,1997, granting development approvals, recites the filing of applications for approval on September 30, 1996, but does not recite that any application was pending as of the sale date of December 12,1992. The Resolution granted approval for 1,160 residential units and 63,200 square feet of retail space.
Sale No. 5 used by defendant’s appraiser occurred on March 28, 1988 and involved property in Jersey City. At the time of sale, approvals were in place for 325 residential units. The deed price was $4,344,282, or $13,367 per unit and $1,028,476 per acre. The appraiser, in determining the per unit price reflected by this sale, added $1,018,218 for environmental clean-up and demolition costs paid by the purchaser. The source of the appraiser’s information as to these costs was an attorney for the purchaser, but the appraiser did not know whether the attorney represented the purchaser at the closing. I sustained an objection to testimony by the appraiser as to such costs on the grounds that the source of his information did not satisfy the requirements of N.J.R.E. 703. Defendant made no attempt to establish that appraisal experts rely on data from such a source. See Ryan v. EDI Sylvan Pools, Inc., 121 N.J. 276, 287-289, 579 A.2d 1241 (1990); Biunno, Current N.J. Rules of Evidence, comment 5 on N.J.R.E. 703 (1998). I will consider, therefore, only the deed price. Curiously, the price per acre determined by the appraiser is based only on the deed price, but his price per apartment unit is based on the deed price plus the clean-up and demolition costs.
In determining the value of the Residential Parcels, I give predominant weight to Sales Nos. 1 and 5 used by defendant’s appraiser. Sale No. 1 is, as noted above, the same as Sale No. 7 used by plaintiffs appraiser. I recognize, as discussed above, that the price paid for property purchased for residential development is generally a function of the number of developable apartment units. However, I am unable to use that methodology here. First, I reject, for reasons stated earlier, the conclusion of defendant’s appraiser that development of the subject property can be *435 assumed at 200 units per acre, the maximum permitted under applicable zoning. The record contains no proofs sufficient to warrant a finding as to an alternative density. Secondly, I reject the per unit value of $15,000 utilized by defendant’s appraiser. The appraiser testified that residential property value is not necessarily directly proportional to the number of units. He acknowledged that a property on which 600 residential units could be constructed does not necessarily have a value triple that of a property on which only 200 units could be constructed. He testified that the price per unit could vary with the number of units. Here, the appraiser used the same per unit value for Lot 2.05, on which he calculated 117 units could be built, as he did for Lot 2.10, on which he calculated 326 units could be built, and for Lot 3.02 (discussed below) on which he calculated 990 units could be built. Defendant’s appraiser failed to value such parcels in a manner consistent with his own opinion that the number of units and value are not directly proportional.
Defendant’s appraiser asserted that, because his sales had densities similar to the maximum permitted densities for the subject parcels, the price per unit from the sales could be applied to the subject parcels. His Sales Nos. 1 and 5, however, do not support his position. The as-built density on Sale No. 1 was 45.6 units per acre, and the as-built density on Sale No. 5 was 77 units per acre. His Sales Nos. 2, 3, and 4, to which I give very little weight, had densities of 30,150 and 251 units per acre, respectively. The weighted average density (aggregate acres divided by aggregate number of units) indicated by Sales Nos. 1 through 5, as described by defendant’s appraiser in his appraisal report, was 53 units per acre, and the unweighted average density (aggregate individual densities divided by the number of sales) was 113 units per acre.
From the comparable sales data presented, I am unable to determine the appropriate per unit value for the subject lots, even if I accepted the premise that value should be determined based on 200 units per acre. As explained above, I reject that premise.
*436 In the absence of sufficient data as to a per unit value, I will value the subject lots on a per acre basis. Both appraisers determined a per acre price reflected by their respective comparable sales, although defendant’s appraiser did not utilize such information in valuing the Residential Parcels. The sales on which I place primary reliance reflect prices of approximately $770,000 per acre and approximately $1,000,000 per acre. As adjusted by plaintiff’s appraiser, the former sale indicates a value for Lots 2.05, 2.09, and 2.10 of $1,000,000 per acre, and $900,000 per.acre for Lot 3.02. Defendant’s appraiser made no adjustments to the latter sale, which, therefore, reflects a $1,000,000 per acre value for the subject lots.
I conclude that the fair market value for Lots 2.05, 2.09, and 2.10 demonstrated by the evidence is $1,000,000 per acre. I accept the adjustments made by plaintiffs appraiser as to Lot 3.02, and conclude that the fair market value for that lot is $900,000 per acre.
Although activity in the residential real estate market improved as of October 1, 1996 and, perhaps, as of October 1, 1995, neither appraiser determined higher values for tax year 1996 or 1997. Accordingly, the foregoing per acre values will be applicable for all •years under appeal. The resulting parcel values are:
Lot 2.05 — $ 585,000
Lot 2.09 — $1,630,000
Lot 2.10 — $ 750,000
Lot 3.02 —• $ 795,000
For each year under appeal, for each such parcel, the ratio of assessment to fair market value exceeds the 100% upper limit of the Chapter 123 common level range. Accordingly, the parcel values must be multiplied by the applicable Chapter 123 ratios (83.43% for 1994, 89.43% for 1995, 92.69% for 1996, and 96.62% for 1997) and the assessments reduced to the following amounts:
*437 Lot 1994 1995 1996 1997
Lot 2.05 $ 488,100 $ 523,200 $ 542,200 $ 565,200
Lot 2.09 $1,359,900 $1,457,700 $1,510,800 $1,574,900
Lot 2.10 $ 625,700 $ 670,700 $ 695,200 $ 724,700
Lot 3.02 $ 633,300 $ 711,000 $ 736,900 $ 768,100
IV
Valuation of Lot 4.03
Remaining for determination is the value of Lot 4.03. I have previously concluded that the highest and best use of this Lot was for a 50,000 square foot retail commercial development as opined by plaintiffs expert. The only valuation proofs for this use were presented by plaintiff. As set forth above, defendant’s appraiser determined a residential highest and best use for this Lot and valued it on the basis of $15,000 per unit for 990 units. These valuation proofs are of no assistance in valuing the Lot for a retail commercial use.
Plaintiffs appraiser determined a value of $525,000 per acre based on three comparable sales, Nos. 3, 5, and 6. Sales Nos. 5 and 6 occurred in February 1995 and January 1995, respectively. I sustained, on grounds of remoteness in time, defendant’s objection to the use of these sales for valuing the subject lot as of October 1, 1993. Thereafter, I reconsidered similar remoteness rulings with respect to sales used by plaintiffs appraiser to value the other parcels under appeal. I did not reconsider my ruling as to the Lot 4 .03 sales. I should have. I will now revise that ruling, in a manner consistent with my modification of my other remoteness rulings, to permit the use of Sales Nos. 5 and 6 of plaintiffs appraiser for all years under appeal.
This revision of my ruling will cause no prejudice to defendant. The sales in question were the subject of full cross-examination. The cross-examination did not relate to year-by-year valuation. Indeed, both appraisers valued Lot 4.03 at the same amount for all years under appeal. I will treat that cross-examination as applicable to 1994. Defendant’s valuation approach and proofs, based solely upon a residential highest and best use, would not have *438 changed if Sales Nos. 5 and 6 of plaintiff’s appraiser were usable for tax year 1994 as well as for tax years 1995, 1996, and 1997.
I find that Sale No. 6 used by plaintiff’s appraiser is entitled to very limited weight. The property was sold for use as a Japanese restaurant, an improvement highly dissimilar to that for which Lot 4 .03 is suitable. The sale is distant from the Hudson County waterfront. The sale property has no access to PATH and no direct access to Route 46. It abuts a creek, and may have wetlands.
Sales Nos. 3 and 5 used by plaintiffs appraiser do not suffer from the infirmities of Sale No. 6. These sales were for retail development, although on scale much larger than the assumed 50,000 square foot budding on Lot 4.03. Sale No. 3 involved property located in the Hudson Exchange Redevelopment District in Jersey City and took place in January 1994 and May 1995. Sale No. 5 involved property in North Bergen, New Jersey and took place in February 1995. These sales, without adjustments, reflect prices of $544,129 and $528,894 per acre, respectively. As adjusted by plaintiffs appraiser, they reflect $516,923 and $528,894 per acre. I accept the appraiser’s adjustments and his value determination of $525,000 per acre, or a total of $2,600,000, for Lot 4.03.
Defendant suggested, in cross-examination of plaintiffs appraiser, that the appropriate unit of value for land used for retail development is per square foot of buildable area at the maximum floor area ratio permitted under applicable zoning. Defendant may be correct, but presented no proofs to support its suggestion. I have valued Lot 4.03 based upon the evidence in the record.
For each year under appeal, the ratio of assessed value to fair market value for Lot 4.03 exceeds the 100% upper limit of the Chapter 123 common level range. Accordingly, the value of $2,600,000 must be multiplied by the Chapter 123 ratio applicable for each year (83.43% for 1994, 89.43% for 1995, 92.69% for 1996, and 96.62% for 1997). The resulting assessments are the following:
*439 1994 — $2,169,200
1995 — $2,325,200
1996 — $2,409,900
1997 _ $2,512,100.
Judgments will be entered in accordance with this opinion.

 The land residual approach requires the appraiser to assume the nature and size of a hypothetical improvement to the subject property, and then determine the value of the improvement, leaving residual land value. The criteria for applicability of the technique are: "1) building value is known or can be accurately estimated, 2) net operating income to the property is known or can be estimated, and 3) both building and land capitalization rates can be extracted from the market." The Appraisal of Real Estate, supra, at 327.