MENYUK, J.T.C.
The following constitutes my decision in this matter, in which plaintiff appeals the tax assessment for the tax year 2001 on property located at 60 East Front Street, identified on the tax map of defendant Borough of Red Bank as Block 27, Lot 8.01. The subject property is an owner-occupied funeral home. The contested assessment is:
Land $ 618,900
Improvements $ 743,100
Total $1,362,000
A complete revaluation was placed in effect in Red Bank for tax year 2001, and Chapter 123 is therefore inapplicable. N.J.S.A. 54:51A-6d.
The appraisal experts of the two parties were the only witnesses at trial. They agreed that the highest and best use of the property was for continued use as a funeral home and each used only the sales comparison approach to valuation. Both experts testified that funeral homes are generally owner occupied, that consequently, there are very few comparable leases and that the income approach is therefore unsuitable. The cost approach was rejected by both experts because of the age of the subject property. See, e.g., Appraisal Institute, The Appraisal of Real Estate 354 (12th ed. 2001) (because cost and market value are more closely related when properties are new, the cost approach is more important in estimating the value of new or relatively new construction).
Based on the sales comparison approach, plaintiffs expert opined that the market value of the subject as of the valuation date of October 1, 2000 was $791,900. Defendant’s expert’s opinion of the value of the subject as of the same date was $2,300,000. *339 The sales comparison approach also presented some difficulties: both experts testified that the market for funeral homes is specialized, that such sales are almost always sales of both the business and the real estate, with the sales price typically being some multiplier of income. In such cases, the buyer and seller allocate some portion of the sales price to the real estate. It is, therefore, important for the appraiser to verify carefully the conditions of each sale. Defendant’s expert additionally testified that while a comparable sale of only real estate was theoretically desirable for appraisal purposes, if the funeral home business is distressed or nonexistent at the time of the sale, it depresses the price of the real estate. While each expert challenged the other’s verification of one or more comparable sales, neither expert disputed the allocation of any sales price between the value of the real estate and the value of the business as made by the buyer and seller involved in any of the comparable sales.
The use by the experts of such comparable sales may cause their opinions of the true value of the real estate to be less persuasive. I nevertheless conclude that the comparable sales method is probative of true value in this ease, where both experts have made the same assumption as to the reliability of the allocated sales prices with respect to their use of comparable sales. See, e.g., Tamburelli Properties Ass’n v. Cresskill Bor., 15 N.J.Tax 629, 643-45 (1996), aff'd, 308 N.J.Super. 326, 705 A.2d 1270 (App.Div.1998) (finding that although this court has generally rejected the use of discounted cash flow analysis, see, e.g., University Plaza Realty v. City of Hackensack, 12 N.J.Tax 354 (1992), aff'd, 264 N.J.Super. 353, 624 A.2d 1000 (App.Div.), certif. den., 134 N.J. 481, 634 A.2d 527 (1993), it is probative of true value where both experts agreed upon the utility of the method and on many of the variables employed by that method).
The subject property is an older, larger funeral home on a relatively small parcel of property in downtown Red Bank, close to Riverview Hospital. Both experts indicated that the hospital sets the character of the neighborhood, which contains many profes *340 sional medical offices, and agreed that the area was desirable for any type of professional office and for a funeral home.
Plaintiffs expert testified that the building contained 9316 square feet used as the funeral home. That figure included an apartment[1] located on the second floor, but did not include any space on the third floor, which plaintiffs expert initially described as an attic. He conceded on cross-examination, however, that some third floor space was utilized as part of the apartment, and that he had not included that square footage in his computation.
As described by plaintiffs expert, the original building is a one-story frame building, probably close to 100 years old, to which was added a second house located adjacent to the first, together with an addition consolidating the two. The. expert testified that, all told, there had been seven or eight additions to the original structure, so that there are now two-story sections, one-and-a-half story sections and one-story sections. Stucco siding was added over the various frame structures at some point to give the building external continuity. Plaintiffs expert testified that, while the building is generally well maintained, the siding has been a problem because stucco does not adhere well to a frame construction. He also testified that the roof has been a maintenance problem. Because of the different levels, and difficulties with the flashing, the roof is prone to leaking.
Plaintiffs expert viewed the relatively small number of parking spaces on the subject property, twenty-six, or approximately 1 per 358 square feet of building area, as below average. He noted that the property is approximately 32,000 square feet, and there is a relatively large improvements-to-land ratio, approximately 29%.
Plaintiffs expert testified that the market for funeral homes during 1998 and 1999 had been volatile because of the activities of publicly traded, multi-state corporations owning and operating funeral homes. According to plaintiffs expert, the national opera *341 tors had rapidly expanded during the early and mid 1990’s, aggressively buying up funeral homes from local operators, and inflating the market for funeral home properties. He testified that in 1998 and 1999, the stock prices of the national companies dropped precipitously due to the rapid over-expansion and the debt incurred in purchasing funeral home properties, and that the national companies thereafter sought to divest themselves of some of their acquisitions. He further indicated that the market for funeral homes did not return to “normal” until 2001. His opinion as to the market trends for funeral homes was supported with commercially available charts of stock prices of national funeral home companies for the period 1998 through 2000, together with anecdotal information from at least one local funeral home operator.
Plaintiffs expert testified that, in selecting comparable sales, he tried to avoid sales negotiated during the period of volatility. He looked for properties that were located as close to the subject as possible, that were older, and were located in a municipality similar to Red Bank. He also looked for properties that had a relatively small site in comparison to the size of the improvements.
Plaintiffs expert utilized four comparable sales. Sale 1, Thompson Funeral Home in Red Bank, with improvements of 6115 square feet, sold on January 17, 2001. Plaintiffs expert testified that, like the subject, this was also an older building with limited paved parking. In his view, the sale was particularly valuable for comparison purposes because the transaction was for the sale of real estate only, without an accompanying sale of the funeral home business.
The sale price was $850,000 or $139 per square foot. Plaintiffs expert indicated in his report that he had made a negative adjustment of 8% for time of sale, which was approximately three and one-half months after the relevant valuation date of October 1, 2000. In his testimony, he corrected the adjustment to a negative 2%. Plaintiffs expert indicated that the appropriate adjustment for market conditions, which were said to have improved after the October 1, 2000 valuation date, was 7% a year. Plaintiffs expert *342 also adjusted the sales price downward 20% for the condition of the property, which he regarded as superior to the subject. He made further negative adjustments of 10% for the ratio of the square footage of the improvements to the square footage of the land (the “improvements-to-land ratio”) and on-site parking and 5% for building style and quality. As contained in his report, his adjusted sale price was $774,378, or $83.12 per square foot. He testified that after correction of the adjustment for time of sale, his adjusted sale price was $88.54.
On cross-examination, plaintiff’s expert was vague as to when he had visited the property and as to when the photographs contained in his report had been taken, and he could only state that it had been sometime between the closing in January 2001 and the date of his report, September 5, 2002. The photographs of Sale 1 contained in the report showed a circular driveway in the process of being constructed and site preparation for what plaintiffs expert testified was to be a parking lot. The building in the photographs appeared attractive and well maintained. Plaintiffs expert testified that the photographs in the report accurately represented the condition of the property on the closing date of the sale, but later conceded that the circular driveway had been constructed after the sale. He also testified that the area being prepared for paving had previously been grass, and that overflow parking had been available there prior to the sale. He stated that he had spoken with the buyer, and that the buyer had indicated to him that there was very little work to do in the building because it was in very good condition.
Defendant’s expert testified that he had rejected the sale because the purchaser had made significant improvements to the property and defendant’s appraiser could not confirm the costs of the improvements. He noted that the buyer initially told him that the property was going to require a significant amount of money to put the property in operating condition. There had been only ten parking spaces on the property at the time of the sale. Contrary to the testimony of plaintiffs expert, defendant’s expert testified that the area of the property currently being prepared for use as a parking lot had not been grassy, but had been wooded, *343 and required substantial expense to prepare. Defendant’s expert estimated that the buyer had spent $225,000 in site improvements alone. He further testified that, in the area of Red Bank in which Sale 1 was located, outside of the downtown, there were no parking garages or other parking facilities such as were available close to the subject. Defendant’s expert also testified that the buyer had told him that the entire exterior had been painted, that portions of the roof had been redone and that the interiors had been redone after the purchase.
Plaintiffs expert’s Sale 2, also used by defendant’s expert, was the October 30, 2000 sale of the Waitt Funeral Home on Route 79 in Morganville, Marlboro Township. Plaintiffs expert testified that the purchaser paid an additional $200,000 for the sale of the business over and above the consideration set forth in the deed, $1,150,000. According to plaintiffs expert, the agreement provided that the buyer would subdivide the ten acre parcel and sell back the six acre rear parcel with an access easement to the seller. He indicated that $60,000 was subtracted from the deed consideration to reflect the sale of the excess land back to the seller, resulting in a sale price of $1,090,000, or $155.23 per square foot for the funeral home and the remaining land.
Plaintiffs expert testified that the building was 7022 square feet, consisting of 3926 square feet on the first floor, 1596 square feet on the upper level and 1500 square feet in the basement used as a casket selection room. His testimony was based on a sketch and description of the property prepared by an appraiser retained in connection with the mortgage financing.
Plaintiffs expert made negative adjustments of 20% for building age and condition and 20% for improvements-to-land ratio and on-site parking. After adjustment, the price per square foot for plaintiff’s expert’s Sale 2 was $92.14.
Plaintiffs expert’s Sale 3 was the March 23, 2001 sale of the 7000 square foot Pfleger Funeral Home in Middletown, for a sale price of $865,000, or $123.57 per square foot. Plaintiffs expert made a negative adjustment of 3% for time of sale, a negative adjustment of 20% for building age and condition, and a further *344 negative adjustment of 20% for improvements to land ratio and on site parking. His adjusted sale price was $93.14 per square foot.
I denied defendant’s trial motion to exclude testimony about this sale on the ground that the funeral home was purchased from a family partnership in which the purchaser was a partner, and that the sale therefore did not represent a market value transaction. Plaintiffs expert testified that the sale price was negotiated based on an appraisal, and he felt that a price negotiated on that basis was more desirable than an allocation of the sales price between the real estate and the business by the parties.
Real property must be assessed at true value, and in this State, true value is generally “expressed in terms of the price that could be obtained for the property in money at a fair sale between a willing buyer and a willing seller.” Ford Motor Co. v. Edison Tp., 127 N.J. 290, 298-99, 604 A.2d 580, 584 (1992). There is a significant risk that a sale price based only on appraisal value will not reflect market value. Pepperidge Tree Realty Corp. v. Kinnelon Bor., 21 N.J.Tax 57, 66 (2003), appeal docketed, No. A75803T5 (App.Div. Oct. 2, 2003). On the other hand, many of the comparable sales testified to by both plaintiffs and defendant’s experts are based on agreements by the parties to the transactions as to the allocation of the sales prices between the real estate and the business. The sales price allocated to the real estate may not, therefore, reflect market value with any degree of precision.
Evidence of sales relied upon by an expert serves both as “independent evidence for the fact-finder and support for the expert’s opinion of value.” Ford Motor Co. v. Edison Tp., supra, 127 N.J. at 308, 604 A.2d at 589, quoting State v. Azzolina Land Corp., 101 N.J.Super. 103, 108, 243 A.2d 276, 279 (App.Div.1968).
In this case, plaintiffs expert did not testify as to any of the details of the appraisal on which the sale price was said to have been based, except that it was apparently an appraisal of both the real estate and the funeral home business. Although plaintiffs expert testified that he felt an appraisal price was more desirable than an allocation between buyer and seller of the portion of the sales price attributable to the realty, he conceded on cross exami *345 nation that the buyer and seller had allocated the purchase price between the real estate and the business. It was unclear from his testimony whether this allocation was based on the appraisal, or was made on some other basis. Moreover, in defending his use of Sale 3 on cross-examination, plaintiffs expert stated that exposure to the market was desirable in selecting comparable sales, but he expressed doubt that very many funeral homes at all, including sales used by him and, by inference, defendant’s expert, were so exposed, due to the specialty type of market that exists for such properties. Taken together with the relationship between the buyer and the seller, I find little in plaintiffs expert’s testimony regarding Sale 3 that would support his conclusion that the sale is a reliable indicator of market value, and accordingly give it almost no weight.
Plaintiffs expert’s Sale 4 was the February 10, 2000 sale of the Kurzawa Funeral Home in Sayreville, for a price of $300,000, or $77.86 per square foot. The building size, 3853 square feet, was substantially smaller than that of the subject and of plaintiffs expert’s other comparable sales. The lot size was .302 acres and it had fifteen on-site parking spaces. Plaintiffs expert made an upward adjustment of 5% for market conditions, even though the sale was consummated during the period that plaintiffs expert deemed volatile. He made an upward adjustment of 20% for location, and a downward adjustment of 5% for improvements-to-land ratio and on-site parking. He made no adjustment for age and condition, although the photographs in plaintiff’s report showed a building substantially less attractive than the subject. His adjusted sales price was $94.02. Plaintiffs expert indicated that Sale 4 had been on the market for several years listed at $450,000, but that when it was eventually sold for $300,000, the sale had been strictly a sale of the real estate, with no additional consideration for the business or for goodwill. Plaintiffs expert testified that it was for this reason that he used Sale 4.
Plaintiffs expert placed most weight on his Sale 1, because it is situated in the same municipality as the subject, and except for differences in condition and land size, he considered it a highly reliable indicator of value. His final value conclusion for the *346 subject was $85.00 per square foot or $791,900, based on 9316 square feet.
In employing his comparable sale approach, defendant’s expert calculated the size of the subject building differently than had plaintiffs expert. Defendant’s expert testified that the subject building contained 10,939 square feet, including the part of the apartment located on the third floor which had been omitted by plaintiffs expert, and also including third floor space in another part of the building, which was used for storage. Defendant’s expert also included a portion of the basement used as an embalming room. He explained that in some of the comparable sales used by him and by plaintiffs expert, the embalming room is located on the upper levels and included in the square footage used in funeral home operations, and that it was necessary to include the embalming room in order to fairly compare the properties.
Defendant’s expert did not view the subject’s limited on-site parking to be a large detriment, because of the wide availability of nearby off-site parking, a situation he described as fairly typical for funeral homes in downtown areas. He noted that the hospital owned a parking garage with over 300 spaces open to the public, which was located immediately adjacent to the subject.
Defendant’s expert testified that the building was large by funeral home standards, because it had two large viewing rooms as well as a chapel, which permitted more than one funeral to be conducted at the same time. He noted that the chapel had stained glass windows and pews. He agreed with plaintiffs expert that the subject had some items of deferred maintenance, such as the roof and some of the flooring and carpeting, but defendant’s expert regarded these items as part of the routine maintenance of the property.
Defendant’s expert also noted that the subject had a 1624 square foot masonry garage at the rear of the property. He indicated that such a structure is important in the operation of a funeral home for use in garaging the cars or for other storage purposes. He testified that the lack of such a structure at a funeral home has a negative impact on value.
*347 Defendant’s expert utilized five comparable sales. He testified that, in selecting his comparable sales, he was looking for larger, older funeral homes that had garages and were preferably located in a downtown area, with sale dates within a year or two of the valuation date. He indicated that there were few, if any, funeral homes as large as the subject, so he looked for homes with at least two viewing rooms.
Defendant’s Sale 1 was the Day Funeral Home located down the street from the subject in Red Bank. Defendant’s expert testified that Sale 1 had sold on September 28, 2000 for a price of $2,250,000, or $289.46 per square foot. On cross-examination, however, defendant’s expert conceded that he had been aware that the transaction was more complicated than a straight-forward sale: there had been a prior lease of the premises to a national funeral home company with an obligation to purchase. The original lease purchase deal had apparently been struck in 1997, at about the same time that the sellers had sold another funeral home to the same national company. Defendant’s expert additionally conceded that, while he was not certain whether a firm purchase price had been agreed upon in 1997, certainly numbers had been discussed.
Defendant’s expert’s Sale 1 included an improvement of 7773 square feet, counting a finished basement area, which, according to defendant’s expert, constituted about one third of the square footage used in the funeral home operation. Defendant’s expert made a negative adjustment of 10% for age and condition, and a 10% negative adjustment for the separate garage, which defendant’s expert regarded as superior to the subject because it was larger and immediately attached to the building and more accessible. He made a negative 5% adjustment for building coverage and parking. He made positive adjustments of 5% for building finish and layout, due to the relatively large amount of its area located in the basement as compared with the subject, and of 10% for building size. Defendant’s expert testified that, typically, the smaller the building, the larger the per unit value. His adjusted price per square foot was $202.62.
*348 Defendant’s expert’s Sale 2 was the July 27, 1999 sale of the 5872 square foot Johnson-McGinley Funeral Home in Wall Township, for a sale price of $1,400,000, or $238.42 per square foot. He made an upward adjustment of 10% for time of sale. Defendant’s expert testified that he had made adjustments of 10% a year commencing in 2000, which he characterized as being fairly close to the 7% used by plaintiff’s expert. Defendant’s expert’s report indicates he made adjustments of 5% a year through 1999.
Because Sale 2 was in a less developed area, defendant’s expert made a positive adjustment of 10%. Sale 2 was of newer construction, built in 1955, and defendant’s expert made a negative adjustment of 10% for its superior condition, a negative adjustment of 15% for Sale 2’s building coverage and parking, which defendant’s expert described as “ample,” a negative adjustment of 5% for a superior garage, and a final negative adjustment of 10% for building size. He made a positive adjustment of 5% for vinyl siding, which he regarded as inferior to the subject’s brick and stucco finish. Defendant’s expert’s adjusted sale price for Sale 2 was $196.70 per square foot.
Defendant’s expert’s Sale 3 was the Waitt Funeral Home on Route 79 in Morganville, Marlboro Township, which was also plaintiffs expert’s Sale 2. There were substantial differences in the experts’ testimony, however, regarding the conditions surrounding the sale. With respect to the subdivision of the property in connection with the sale, defendant’s expert testified that, while the contract of sale contemplated that four acres would remain with the funeral home, as plaintiffs expert had testified, the subdivision as originally proposed turned out to be unworkable, and that as actually subdivided, the funeral home property was a little over two acres and the rear property kept by the seller was closer to eight acres. Further, defendant’s expert testified that the $60,000 which changed hands in connection with the subdivision, and which plaintiffs expert had subtracted from the sale price, was not a sale price for the subdivided land sold back to the sellers, but a reimbursement of the costs incurred by the funeral home purchaser in connection with the subdivision. Accordingly, defendant’s expert testified that the sale price was $1,150,000.
*349 Defendant’s expert’s report for his Sale 3 indicated that the building had 4877 square feet. In his direct testimony, however, he noted that he had failed to include approximately 1000 square feet in the basement used as a casket showroom. Accordingly, defendant’s expert testified that the building had a total of 5877 square feet broken down as follows: first floor, 3797 square feet; second floor, 1080 square feet, and basement, 1000 square feet. His testimony was based on the property record card and his own inspection of the property. Using his measurement of the building, defendant’s expert testified that sales price per square foot, before adjustments, was $195.68.
Defendant’s expert made a positive 10% adjustment for location, a positive 10% building finisb/layout adjustment because the embalming room was located on the first floor, which the expert testified was an unusual layout, and also because of the operational use of the basement as a casket room. He made a positive 10% adjustment for Sale 3’s lack of a garage or separate storage building and negative adjustments of 10% for the size of the building and 15% for building coverage/parking, which was superi- or to the subject’s. The adjusted sale price of Sale 3 was $205.46.
Defendant’s expert’s Sale 4 was the May 17, 1999 sale of the 4364 square foot Speer-Van Ardsdale Funeral Home in Somer-ville, for a sale price of $1,050,000, or $240.60 per square foot. Defendant’s expert testified that the total price, including goodwill, was $1,800,000, but that the $1,050,000 amount represented the sale of the real estate only. The improvements included in this sale are a little older than the subject. The property has less than ample on-site parking. Like the subject, however, there is off-site parking available. Defendant’s expert made positive adjustments of 11% for time of sale, and of 5% for the vinyl siding building finish. He made negative adjustments of 10% for somewhat superior parking, and 10% for building size. His adjusted sale price was $227.01 per square foot.
Defendant’s expert’s Sale 5 was the sale on February 1, 2002 (sixteen months after the relevant assessment date) of the 5080 square foot Piscataway Funeral Home, in Piscataway Township, *350 for a sale price of $1,200,000, or $236.22 per square foot. Defendant’s expert testified that Sale 5 was, like the subject, an older building, and was constructed in a bi-level fashion: that is, from the entrance, there were stairs going up and stairs going down, so that approximately half the building was below grade. Defendant’s expert made a negative adjustment of 13% for time of sale, and additional negative adjustments of 10% for better parking, 5% for a superior garage, and 10% for building size. He made a positive adjustment of 10% for the inferior layout of the building. His adjusted sale price for Sale 5 was $174.68 per square foot.
Based on adjusted sales prices ranging from $178.68 to $227.01 per square foot, defendant’s expert concluded that the subject should be valued at $210 per square foot, or based on 10,939 square feet, $2,300,000, rounded.
Both plaintiffs and defendant’s experts expressed agreement with the basic principle that an appraiser must carefully verify the market data obtained in order to ensure the reliability of value conclusions. See Appraisal Institute, The Appraisal of Real Estate 420-21 (12th ed. 2001). Both experts conceded errors in verification of data. I must nevertheless determine the true value of the subject, notwithstanding that the experts disagreed with respect to significant facts regarding- the subject as well as some of the comparable sales. Ultimately, it is for the trier of fact to determine “the evidential value and weight to be given to the testimony of conflicting experts ... and this weight depends upon their candor, intelligence, knowledge, experience and especially upon the facts and reasoning which are offered as the foundation of their respective opinions.” Coastal Eagle Point Oil Co. v. West Deptford Tp., 13 N.J.Tax 242, 299-300 (1993), aff'd, 15 N.J.Tax 190 (App.Div.1995), certif. den., 143 N.J. 320, 670 A.2d 1061 (1995).
Because both experts reached a conclusion of value on the basis of comparable sales prices per square foot used in funeral home operations, the square footage calculation for the subject is critical. Defendant’s expert’s testimony regarding the calculation of the square footage was precise and detailed. Plaintiffs expert conceded that he had failed to include some square footage *351 constituting a part of the subject’s apartment where he had plainly included the square footage attributable to such apartments in his comparable sales where applicable. I find defendant’s testimony to be more credible and convincing than that of plaintiffs expert on this point. I therefore conclude that the subject has 10,939 square feet of improvements.
The experts also varied widely in their description of plaintiffs Sale 1 at the time of the sale. Plaintiffs expert was vague as to when he had originally viewed the property. He first testified that the pictures in his report accurately portrayed the property at the time of the sale, but later conceded that a large circular driveway in the front of the property had been constructed after the purchase. I find the testimony of defendant’s expert as to the condition of plaintiffs Sale 1 at the time of the sale to be more credible than that of plaintiffs expert. Consequently, there is little support for plaintiffs expert’s adjustment for the condition of Sale 1 as compared to the subject. I therefore give plaintiffs expert’s Sale 1 little weight.
The experts also disputed several aspects of the sale of the Waitt Funeral Home, which was plaintiffs expert’s Sale 2, and defendant’s expert’s Sale 3. With respect to the square footage, plaintiffs expert testified that the improvement was 7022 square feet. Defendant’s expert report gave the square footage for the same building as 4877 square feet, but corrected that to 5877 square feet in his direct testimony by explaining that he had failed to include the basement which was used in the funeral home operations. He conceded that he may have gone back to reconsider his measurements after reviewing plaintiffs expert’s report, but his explanation for the omission was candid and believable. Plaintiffs expert, on the other hand, admitted that, with the exception of his Sale 4, he did not personally measure any of his compara-bles. In some cases he relied on sketches that had been prepared by others. He also relied on tax information or on information from other appraisers. I conclude that the appropriate measurement to be used for the Waitt Funeral Home is the square footage used by defendant’s expert, as he corrected it in his testimony, 5877 square feet.
*352 The experts also differed in their accounts as to the terms of the sale of the Waitt Funeral Home, particularly the subdivision of the property. Again, I find the testimony of defendant’s expert regarding the subdivision as it eventually was effectuated and as to the basis of the $60,000 payment later made by the seller to the buyer to be detailed and credible, and the testimony of plaintiffs expert to be vague and unconvincing. Consequently, I find that the sale price of plaintiffs expert’s Sale 2 and defendant’s expert’s Sale 3 was $1,150,000 and that the amount of land purchased with the funeral home was approximately two acres.
For the reasons I have already indicated, I give little weight to plaintiffs expert’s Sale 1 and Sale 3. Plaintiff’s expert effectively conceded that his Sale 4, the Kurzawa Funeral Home in Sayre-ville, was not a good indicator of market value, due to its lack of comparability in terms of location and size. He testified that he had used it principally because it was a sale of real estate only. He also testified, however, that the property had been on the market for a long time prior to its sale, which resulted in a price significantly lower than the initial listing price. Under the circumstances, I cannot give Sale 4 much weight.
Plaintiffs expert’s testimony regarding the circumstances surrounding the price or sales negotiation of defendant’s expert’s Sale 1, the Day Funeral Home in Red Bank, was credible, and I conclude that, although the sale closed on September 28, 2000, the purchase price was negotiated long in advance. A national operator of funeral homes was the purchaser under a lease-purchase agreement, and I find convincing plaintiffs expert’s testimony regarding the unusual motivation of such purchasers. I note that the per square foot purchase price, before adjustment, was $289.46, the highest of any of defendant’s comparable sales. I conclude that defendant’s expert’s Sale 1 is not a reliable indicator of market value, and I give it little weight.
I give the most weight to the sale of Waitt Funeral Home, which was used by both experts. The sale date was October 30, 2000, just after the relevant valuation date of October 1, 2000, and past the period of market volatility testified to by plaintiffs expert. As *353 explained above, I found plaintiffs expert’s testimony to be inaccurate with respect to the terms and conditions of the sale, as well as the square footage of the building. The correct price per square foot, unadjusted, was $195.68.
Plaintiffs expert’s testimony was also inaccurate regarding the size of the parcel following the subdivision, which was closer to two acres than the four acres testified to by plaintiffs expert. Accordingly, his 20% negative adjustment for improvements to land ratio and on-site parking is not reliable. I find defendant’s expert’s adjustment of a negative 15% for building coverage and parking to be more credible. Defendant’s expert’s testimony regarding his adjustments to the Waitt Funeral Home was generally credible, and resulted in an adjusted sale price of $205.46. Even if I were to apply plaintiffs expert’s only other adjustment to the $195.68 per square foot sale price for the Waitt Funeral Home — a negative 20% adjustment for building age and condition — and also to apply defendant’s expert’s adjustment of a negative 15% for building coverage and parking, the adjusted sale price would be $127.19 per square foot. At that price, the 10,939 square foot subject property would be valued at $1,391,000, rounded, more than the assessment in issue here.
I note, too, that plaintiffs expert made negative 20% adjustments for building age and condition to all of his comparable sales, except for Sale 4, where he made no adjustment. In making those adjustments, he placed heavy emphasis on the subject’s leaking roof. On cross-examination, however, he was evasive when questioned about his discussions with the subject’s owner regarding the costs of repairs. While I have used his negative 20% adjustment to the Waitt Funeral Home for illustrative purposes, I do not find the reasoning underlying the adjustments on account of age and condition to be entirely credible.
I also give some weight to defendant’s expert’s Sales 2, 4 and 5, with adjusted sales prices ranging from $174.68 (for sale 5, which took place on February 1, 2002, well after the period of volatility testified to by plaintiffs expert), to $227.01 per square foot. I conclude that an appropriate value for the subject is $200 per *354 square foot. At 10,939 square feet, I find the value of the subject to be $2,187,800.
The tax year in issue, 2001, was a revaluation year. Because there is no counterclaim in this action, no increase in the assessment may be made, notwithstanding my finding as to the true value of the subject. See Passaic Street Realty Assoc., Inc. v. Garfield City, 13 N.J.Tax 482, 484-85 (1994), citing F.M.C. Stores Co. v. Morris Plains Bor., 100 N.J. 418, 495 A.2d 1313 (1985) and N.J.S.A. 54:51A-6d. The assessment of $1,362,000 is therefore affirmed. Judgment will be entered accordingly.,

 Several of the comparable sales contained apartments that serve as the residence of the owner or manager of the funeral home. Such apartments are apparently a common feature of such properties.